# IN THE SUPREME COURT OF IOWA

No. 19–0514

Submitted January 20, 2021—Filed June 25, 2021
Amended September 30, 2021

**PSFS 3 CORPORATION,**

Appellee,

vs.

**MICHAEL P. SEIDMAN, D.D.S., P.C.,** d/b/a **DENTAL ASSOCIATES OF CAPE COD** and **MICHAEL P. SEIDMAN,** Individually, et al.,

Appellants.

---

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

Nearly 300 optometrists and dentists, consolidated into two cases, appeal the district court's rulings on common and specific issues of personal jurisdiction and the legality of contract terms, as well as the entry of judgment of damages against each defendant without individual trials on the issue of damages in violation of the defendants' due process rights. **AFFIRMED.**

Appel, J., delivered the opinion of the court, in which all justices joined.

Ronald P. Gossett (argued) of Gossett & Gossett, P.A., Hollywood, Florida, and Billy J. Mallory of Brick Gentry, P.C., West Des Moines, for Gossett appellants.

David H. Charlip of Charlip Law Group, LC, Miami, Florida, and Matthew L. Preston (argued), Brad J. Brady, and Cara L. Roberts of Brady Preston Gronlund PC, Cedar Rapids, for Charlip appellants.

Benjamin P. Roach and Randall D. Armentrout (argued) of Nyemaster Goode, P.C., Des Moines, for appellee.

**APPEL, Justice.**

In this case, hundreds of optometrists, dentists, and their professional associations appeal from money judgments entered in Polk County District Court in favor of an Iowa corporation arising from finance agreements related to the purchase from a third-party vendor of multimedia systems for their waiting rooms. After consolidating the cases and trying two bellwether actions, the district court found that the finance agreements were enforceable and entered a judgment for damages against each bellwether defendant using a formula for damages presented by the plaintiff. The district court then applied the damages formula against the remaining defendants based upon proposed orders submitted by the plaintiff finance company which provided individual calculations of the amounts owed by each defendant.

The defendants appeal. They raise a wide variety of substantive and procedural challenges including questions related to personal jurisdiction, the application of a floating forum-selection clause to the case, the proper measure and approach to damages, the application of various provisions of Iowa Code chapter 535 (2009) to the agreements in this case, the imposition of an 18% default rate alleged to be unconscionable under the facts and circumstances, and the orders finding the defendants liable for attorney fees.

For the reasons expressed below, we affirm the rulings and judgments of the district court.

## I. Factual and Procedural Background.

### A. Overview of the Underlying Dispute.

1. *The transaction.* In the years between 2005 and 2008 or 2009, NCMIC Finance Corporation (NCMIC) and the optometrists, dentists, and their professional associations entered into finance agreements related to

the purchase of Exhibeo multimedia systems for their waiting rooms. The Exhibeo systems included a computer, monitor, and software.

The principal place of business of NCMIC is Clive, Iowa. With one exception, the material terms of the finance agreements between NCMIC and the defendants were identical. They all contained a common "hell-or-high-water clause," a floating forum-selection clause, and a default provision authorizing acceleration of all future payments and the assessment of a default interest rate of 18% interest per annum.

The vendor of the Exhibeo systems, Brican America, Inc. and later Brican America, LLC (Brican), sold these systems by allegedly making representations that a third party would purchase enough advertising on the systems to cover the finance payments and that if the advertising stopped Brican would buy back the systems and assume any remaining liability. The advertising payments stopped, but Brican refused to buy back the systems. The defendants then stopped making payments to NCMIC under the finance agreements.

2. *The litigation.* As a result of the dispute, defendants filed several putative class actions, two in the United States District Court for the Southern District of Florida, one in the United States District Court for the District of New Jersey, and one in the United States District Court for the Central District of California. In these putative class actions, the defendants sought, among other things, a declaration that the finance agreements were not enforceable. At about the same time, NCMIC assigned its interests in the finance agreements to a newly formed wholly owned subsidiary, PSFS 3 Corporation (PSFS 3).[1] The assignment allowed

---

[1]NCMIC also conducted business under the name Professional Solutions Financial Services (PSFS) which should not be confused with the NCMIC subsidiary PSFS 3.

PSFS 3 to invoke a floating forum-selection clause in the finance agreements in which the parties agreed that the local courts where the headquarters of an assignee are located would have jurisdiction over disputes under the finance agreement. After the assignment, PSFS 3 filed hundreds of cases against individual defendants in Polk County District Court seeking to enforce the terms of the finance agreements.

With multiple lawsuits in several forums threatening incoherent results, the United States Judicial Panel on Multidistrict Litigation (MDL Panel) consolidated the federal actions in the Southern District of Florida. The litigation against individual defendants in Polk County was stayed during the Florida federal court proceedings. After the conclusion of the federal court litigation favorable to NCMIC and PSFS 3, the Polk County District Court lifted its stay of the enforcement actions in Iowa.

Following the consolidation of the cases and a series of unsuccessful dispositive motions, the parties orally agreed to a stipulation that provided that the parties would try two bellwether cases (Busch and Insoft) and that "rulings and orders therefrom shall be binding as to all other remaining cases filed with similar issues and parties and shall constitute issue preclusion." At the conclusion of the two bellwether trials, the district court entered judgment for the plaintiff PSFS 3 and awarded damages in each case.

The plaintiff then moved to enforce the stipulation against the remaining defendants, asserting that all factual disputes had been resolved. PSFS 3 proposed that it submit individual proposed judgments with damages calculations in each individual case along the legal principles established in the bellwether cases. The defendants object to this procedure, asserting they had a due process right to a trial on the issue of damages. The district court, however, adopted the procedure

proposed by PSFS 3 with respect to the remaining cases by asking PSFS 3 to submit proposed judgments in the remaining cases but stating it would give the defendants "an opportunity to respond." After receiving no resistances, the district court proceeded to enter judgments in the hundreds of pending matters.

3. *Issues raised on appeal.* In their appeal, the defendants raise several claims related to the ability of the Polk County District Court to hear the enforcement actions. They claim that because of the rulings in the Florida litigation by the Southern District of Florida and by the MDL Panel, principles of res judicata prevent PSFS 3 from asserting personal jurisdiction of defendants under the floating forum-selection provision. Further, aside from their res judicata argument, the defendants claim that the Iowa district court lacked personal jurisdiction over the defendants because the floating forum-selection provision is unenforceable under the facts and circumstances of the case. In particular, the defendants attack an assignment of the interests in the financing agreements from NCMIC to PSFS 3 for the purpose of triggering a floating forum-selection clause that provided for personal jurisdiction in the state of any assignee.

Second, the defendants raise several specific issues related to personal jurisdiction. With respect to eleven defendants, they claim the actions were filed before NCMIC assigned the company's interests in the financing agreements to PSFS 3 and that, as a result, the original actions were void and cannot support personal jurisdiction against those defendants. One group of defendants, Jeff Wineinger and Cedar Park Vision Center, P.A., argue on appeal that they have a distinctly different finance agreement that has no provision relating to choice of forum, and as a result, the claim against them should have been dismissed for want of personal jurisdiction.

Third, the defendants claim that the finance agreements are unenforceable because they violate two provisions of Iowa Code chapter 535. The first provision defendants argue that the plaintiff violated is Iowa Code section 535.17(1), which requires that material terms of a transaction must be disclosed to the borrower, and that the plaintiff failed to disclose the interest rate the defendants were being charged in the financing transaction. The defendants' second claimed violation of chapter 535 is that the interest rate in the finance agreement exceeded the rate permitted under Iowa's usury statute provided in Iowa Code section 535.2.

Fourth, the defendants claim that PSFS 3 failed to prove the fact of damages arising from the alleged breaches of the finance agreements. They claim that PSFS 3's basic approach to calculating damages by multiplying the number of missed payments times the amount of each payment, was flawed. Instead, the defendants argue that the plaintiff was obligated to apportion a part of each payment to principal and interest and make calculations of damages based on these key factors.

Fifth, the defendants claim that the district court's approach to the damages issues in the case violated due process. They claim that they did not have an opportunity in the litigation to contest on an individualized basis the number of payments that were not paid by an individual defendant. They also claim that final judgments were made against seventy-three parties, who were not signors of any finance agreement, without an opportunity to litigate whether they were a proper party to the proceedings.

Sixth, the defendants claim that the 18% default interest rate in the finance agreements is unconscionable. They claim the high rate of interest amounts to an unjustified penalty and cannot be enforced.

Seventh, the defendants seek to preemptively attack any award of attorney fees to the plaintiff in these cases.

**B. Commencement of Litigation in Iowa and Florida Regarding Enforceability of Finance Agreements.**

1. *Initial Iowa enforcement actions brought by NCMIC.* NCMIC filed several enforcement actions in Polk County District Court in late 2009 and early 2010. NCMIC filed its first enforcement action on December 18, 2009. Additional cases were filed on March 16, 2010, against other defendants.

In the initial Iowa enforcement actions, NCMIC alleged that each party:

> [A]greed to personal jurisdiction and venue in any State or Federal Court located where the assignee[']s corporate headquarters is located. The corporate headquarters of the Plaintiff is located in Clive, Polk County, Iowa. The Iowa District Court in Polk County is therefore the proper court in which to bring this action under the forum selection clause contained in the lease agreement.

A copy of the finance agreement was attached to each petition. The forum-selection clause in Paragraph 13 of the finance agreement stated:

> 13. <u>GOVERNING LAW, CONSENT TO JURISDICTION AND VENUE OF LITIGATION</u>. This Lease and each Schedule shall be governed by the internal laws for the state in which Lessor's or Lessor's assignee's principal corporate offices are located. IF THIS IS ASSIGNED, YOU AGREE THAT ANY DISPUTE ARISING UNDER OR RELATED TO THIS LEASE WILL BE ADJUDICATED IN THE FEDERAL OR STATE COURT WHERE THE ASSIGNEE'S CORPORATE HEADQUARTERS IS LOCATED AND WILL BE GOVERNED BY THE LAW OF THAT STATE. YOU HEREBY CONSENT TO PERSONAL JURISDICTION AND VENUE IN THAT COURT AND WAIVE ANY RIGHT TO TRANSFER VENUE.

Paragraph 13 has been described as a "floating forum selection clause." The proper forum for disputes among the parties to the finance agreement "floats" with each assignment of the interests to the courts

where the assignee's headquarters are located. While the forum-selection clause expressly stated that disputes would be adjudicated in the state where an *assignee*'s corporate headquarters are located, it did not expressly address jurisdiction with respect to disputes involving the original party, NCMIC.

2. *Putative class actions filed in Florida attacking the validity of finance agreements.* While enforcement actions were commenced in Iowa by NCMIC, two groups of doctors filed actions in Florida challenging the enforceability of the finance agreements. On March 3, 2010, a group of doctors represented by attorney David Charlip filed a putative class action in Florida state court seeking to void the finance agreements. On March 16, doctors represented by attorney Ronald Gossett filed an action in federal court in Florida seeking to have the finance agreements declared unenforceable. The simultaneous filings in Iowa and Florida set up a procedural battle regarding the proper forum for the adjudication of the underlying claims.

3. *NCMIC forms PSFS 3 and assigns interests in the finance agreements.* After the filing of the Florida litigation, an unnamed attorney questioned the applicability of the floating forum-selection clause in what NCMIC saw as an attempt to stop Iowa-based enforcement efforts. In response, NCMIC took steps to address the omission in Paragraph 13 of the finance agreement. Counsel for NCMIC recommended that the agreements be assigned to another Iowa corporation because under Paragraph 13, it "is very clear that jurisdiction and venue [are] proper in the home state and county of any assignee." Thus, according to NCMIC counsel, "if these leases are assigned to an Iowa corporation located in Polk County we have a lock on jurisdiction and venue here in Polk County." When NCMIC wrote its lender seeking consent to the assignment, it

advised: "It is important we deal with the possible venue challenge issue immediately in order to thwart the need to potentially litigate defaulted lease contracts outside of Iowa."

On March 30, NCMIC created a new entity, PSFS 3. The same day, NCMIC assigned its lease contract rights to the new corporation. The apparent purpose of the assignment was to create a "lock" on personal jurisdiction in Polk County with respect to enforcement actions filed by PSFS 3, the assignee of NCMIC. After the assignment, PSFS 3 filed numerous additional enforcement actions in Polk County District Court.

PSFS 3 also filed amended petitions in cases filed before March 30. In the amended petitions, PSFS 3 was substituted as the "real party in interest" by "virtue of the assignment." Service was made on the defendants by ordinary mail.

4. *Preliminary skirmishes over forum in Iowa.* Defendants filed motions to dismiss the Iowa enforcement actions based upon lack of personal jurisdiction, lack of venue, and forum non conveniens. The first such motion, submitted by defendant Porter, was heard by the district court on May 25. The *Porter* case involved a transaction where Brican was the original party to the finance agreement but assigned its interest to PSFS. The district court limited its consideration in the motion to the question of whether the floating forum-selection clause in the finance agreement was enforceable. On June 4, the district court entered an order concluding that the floating forum-selection clause was permissive but once PSFS 3 chose to file in its home forum, the purchaser waived the right to seek to transfer the action to another court. As a result, the motion to dismiss was denied. The district court, however, agreed to stay the matter pending resolution of the Florida litigation.

Other defendants filed motions to dismiss with broader arguments than those considered in the *Porter* case. Some defendants claimed that the assignment of a category of leases referred to as the "three column" leases to PSFS 3 occurred after the actions were filed and thus were not applicable to their lawsuits.[2] The defendants further claimed that the floating forum-selection clause did not apply because it became applicable only through a "sham" transaction designed solely to engage in forum-shopping after the filing of litigation in Florida and other states. The defendants also claimed that the floating forum-selection clause was unenforceable because it was unreasonable and unjust. The defendants also invoked the doctrine of forum non conveniens, claiming that Florida was a more convenient forum for the parties than Iowa. In the alternative, the defendants asked for a stay of the action pending resolution of the Florida class action.

PSFS 3 filed a resistance to the motions to dismiss. PSFS 3 defended the assignment of the contracts from NCMIC to PSFS 3 as perfectly valid and not the product of a sham transaction. It asserted that the floating forum-selection clause was not unreasonable under all the circumstances.

Attached to the PSFS 3 resistance was an affidavit from Patrick McNerney, CEO of NCMIC, along with various supporting documents. McNerney reviewed the creation of PSFS 3 and the assignment by NCMIC of contracts to the newly created PSFS 3. He attached the assignment documentation, articles of incorporation of PSFS 3, security agreement,

[2]There were two principal forms of financing agreements in the Florida litigation. The first type, referred to as the full page format, involved doctors signing agreements with Brican as the original financing entity and Brican assigning the agreements to PSFS (NCMIC). The second type, referred to as the three column agreements, involved doctors signing agreements with PSFS (NCMIC) as the original financing entity that were later assigned to PSFS 3 on March 30, 2010.

certificate of incorporation, and bylaws of the new corporation. He stated that PSFS 3 is a wholly owned subsidiary of NCMIC and was capitalized with $500,000 in cash.

The district court held a hearing on the motions to dismiss on July 9. At the hearing, the Gossett defendants, pursuant to Iowa Rule of Civil Procedure 1.431(6), requested the opportunity to cross-examine McNerney, who did not appear for the hearing.

At the hearing, the parties asked the court to consolidate the individual actions. On July 22, the district court entered an order consolidating the cases pursuant to Iowa Rule of Civil Procedure 1.913. The district court stated that while the consolidation remained in place, "any rulings which may be forthcoming . . . shall be considered as having been individually filed in each of the [consolidated] cases."

On August 12, the district court ruled on the pending motions to dismiss. The district court denied the motions. With respect to the Brican-PSFS leases, the district court reaffirmed its prior ruling in the *Porter* action. The district court further addressed an issue not decided in *Porter*, namely, whether the interest being assigned was sufficiently identified in the Brican-PSFS documents. The district court concluded that they were.

On the question of the validity of the assignment of interests in the finance agreements by NCMIC to PSFS 3, the district court held that the assignment was valid. In rejecting the claim that the assignment was a sham, the district court relied extensively on the McNerney affidavit and accompanying documents. The district court noted: "These documents persuasively make the case that PSFS 3 is a separate corporate entity, properly capitalized and which receives the benefit of the monthly lease payments called for under the assignments in question."

The district court further concluded that the language of the floating forum-selection clause created mandatory jurisdiction in Iowa. Further, the district court concluded that under Iowa law, a floating forum-selection provision was enforceable unless "unreasonable or unjust" or invalid for a reason such as fraud or overreaching. On the record made, the district court concluded that the defendants failed to make such a showing.

After the district court's August 12 ruling, the parties engaged in discovery on the assignment issue. The defendants obtained financial records and organizational documents related to PSFS 3. On January 12, 2011, the defendants also deposed McNerney.

After conducting the discovery, on January 24, the defendants again moved to dismiss the actions. The defendants emphasized what was uncovered in the deposition of McNerney. According to the defendants, on the expense side of the ledger, the deposition established that PSFS 3 paid no fees for incorporating, paid no compensation to anyone, had no paid employees, paid no rental for any offices, paid no telephone bills, paid no electrical bills, purchased no office supplies, purchased no paper, nor paid for business cards. The only expenses of PSFS 3 were a payment for bank service charges and an unexplained payment of $264.94 to NCMIC.

On the questions of capitalization and income, the defendants noted that the deposition of McNerney revealed that although the company was formed on March 30, 2010, money was not deposited in any PSFS 3 bank account until May 14 when $500,000 was deposited. Further, in terms of income, NCMIC deposited amounts monthly into PSFS 3's bank account, and then PSFS 3 immediately transferred the exact same amount back to NCMIC.

PSFS 3 resisted dismissal and filed a supplemental affidavit from McNerney. PSFS 3 addressed the challenge to the assignment of the three

column leases to PSFS 3.  Among other things, PSFS 3 noted that it was common for wholly owned subsidiaries to rely on employees of the parent and to share common space with a parent.  PSFS 3 noted that it signed a $13,500,000 promissory note with NCMIC as compensation for the assignment of the three column leases.  PSFS 3 further noted that $500,000 in capital was transferred on March 31, on to the general ledger of the new corporation and deposited into a PSFS 3 account once Wells Fargo Bank completed the necessary internal activities to activate the account.

On March 3, 2011, the district court again denied the motion to dismiss.  The district court stated it had carefully reviewed the McNerney testimony.  The district court, however, concluded that while the plaintiff may have gone to great lengths to create an assignment which would form the basis for the use of the floating forum-selection clause, the defendants "have not convinced the court that this underlying assignment is fraudulent or otherwise a 'sham.' "  The district court, however, agreed to the defendants' motion to stay the three column proceedings pending developments in the Florida litigation.

5. *Preliminary skirmishes in Florida over forum.*  On May 5, 2010, NCMIC (PSFS) filed a motion to dismiss the Florida federal court action or to transfer it to the Polk County District Court.  The federal district court denied the motion on several grounds.  First, the district court observed that the floating forum-selection clause was permissive, not mandatory.  Second, the district court noted that the putative class action was filed prior to the assignment of finance agreements in the case and thus "it would be inequitable to allow Defendants to shop the actions to another forum simply by assigning the Leases after the lawsuit [was] filed."  Finally, the district court noted that the MDL Panel had expended resources and

decided that the actions were "triggered belatedly for the purposes of forum shopping."

After similar actions against NCMIC were filed in other federal district courts, the Charlip and Gossett defendants filed a motion with the MDL Panel to transfer all similar actions to the Southern District of Florida. NCMIC and PSFS 3 responded to the motion, arguing that Florida was an improper venue because the leases contained the floating forum-selection clauses which would require the claims to be litigated in Iowa. The MDL Panel transferred the cases to the Southern District of Florida, stating "[w]e are persuaded that the Southern District of Florida is an appropriate . . . forum."

**C. Conclusion of Federal Court Litigation in Florida.** The litigation in Florida proceeded to resolution. In a series of rulings, the federal district court proceeded to winnow the claims through summary judgment proceedings. On August 1, 2013, the district court ruled that under the finance agreement, the cancellation provision did not invalidate the hell-or-high-water clause of the contracts. On January 22, 2014, the district court ruled that to the extent Brican made misrepresentations to doctors that it would " 'buy back,' 'repurchase' or 'assume assignment' of the Financing Agreement," it was not acting as an agent for NCMIC. The district court noted, however, that enforcement was subject to "defenses unique to individual plaintiffs that were not and could not have been asserted within the scope of the common questions of law or fact presented in this action."

On May 7, 2015, the district court entered final judgments in the cases involving three column leases. The doctors appealed. On November 22, 2016, the United States District Court for the Eleventh Circuit affirmed.

**D. Iowa Proceedings After the Conclusion of the Florida Litigation.**

1. *Pretrial proceedings.* On January 3, 2017, the Polk County District Court lifted the stay on the Iowa cases. A trial was scheduled for December 11 for all the cases. The district court ordered the defendants to amend their answers to raise any and all affirmative defenses within fifteen days of the order. The district court further ordered the parties "to select those cases for trial first that have the most common issues as to as many parties as possible and proceed there from the most issues to the least issues."

On March 7, the defendants opted to continue the litigation with two large groups of defendants (one group represented by Gossett and the other by Charlip). The Gossett defendants filed a consolidated document with amended answers and affirmative defenses. The Gossett defendants raised fifteen additional affirmative defenses, including: (1) lack of personal jurisdiction, (2) violation of Iowa Code section 535.17, and (3) violation of Iowa's usury statute contained in Iowa Code section 535.4. The Gossett defendants also counterclaimed for a declaratory judgment that PSFS 3 waived its right to attorney fees in federal courts by failing to timely file. The Charlip defendants filed a similar amended answer and affirmative defenses.

On May 5, PSFS 3 moved for summary judgment. The general thrust of the motion was that the federal district court had ruled in favor of the enforceability of the finance agreements, subject only to unique individualized defenses and that the defendants were precluded from relitigating the issues that were brought, or could have been brought, in the Florida federal court action. The defendants resisted, noting, among

other things, that issues unique to individual defendants remained to be litigated.

On August 4, the district court denied the motion. The district court found that the defendants did not include certain Iowa law claims in the Florida litigation for fear of destroying commonality. Further, the district court found that there were genuine issues of material fact on whether the material terms of the financing agreements were included in the documents, whether the financing agreements violated Iowa usury law by not including a rate of interest, whether NCMIC is entitled to default interest on future amounts due to accelerating the amount owed, and whether NCMIC is entitled to recover attorney fees in the Iowa court for fees incurred in the Florida litigation.

After the denial of the motion, the parties continued discovery. On the issue of damages, PSFS 3 answered interrogatories asking how damages were calculated and produced records showing the total number of payments made by each defendant on their respective finance agreements.

On October 12, PSFS 3 renewed its motion for summary judgment. The plaintiff asserted in the second summary motion that the terms of the finance agreements complied with Iowa Code chapter 535 and that the 18% default rate was not unconscionable. Also on October 12, the Gossett and Charlip defendants filed a motion for summary judgment on their affirmative defenses. They claimed that the failure to disclose the interest rate and the interest rate itself violated Iowa Code section 535.17(1) related to material disclosures and section 535.2 dealing with usurious rates of interest.

At the hearing on the motions on November 21, the district court did not provide a ruling. The district court again urged the defendants to file

any defenses unique to individual defendants. Specifically, the district court noted, "The parties shall raise any and all defenses by December 1, 2017 or be barred from raising them at any future time." In response, three defendants filed amended answers.[3]

2. *Trial of bellwether cases.* With one exception, the finance agreement was identical in all cases.[4] On November 21, 2017, the parties entered into a stipulation to try two bellwether cases against defendants Insoft and Busch: "The parties agree that the two trials on December 11 and 12, 2017 and the rulings and orders therefrom shall be binding as to all other remaining cases filed with similar issues and parties and shall constitute issue preclusion."

On December 11 and 12, the district court held bench trials in the bellwether cases. The parties filed posttrial briefs. On April 9, 2018, the district court issued an order entitled "Ruling and Order on Plaintiffs' and Defendants' Motions for Summary Judgment." In the ruling, the district court held that the finance agreements were enforceable and ordered PSFS 3 to submit proposed judgment entries on damages in the bellwether cases. The PSFS 3 submission determined the damages by calculating the payments that were unpaid under each agreement. PSFS 3 further sought default interest, late fees, unpaid taxes, and court costs.

3. *Calculation of damages in bellwether cases.* On June 15, 2018, the district court entered judgment in the bellwether cases. The Busch and Insoft defendants filed a motion to reconsider on June 25. In their

---

[3]Andrea Gentile-Fiori and Gary Goberville claimed that their business entities should have been sued rather than themselves personally. Jeffrey Mellom challenged the signature on the finance agreement that PSFS 3 sought to enforce.

[4]Wineinger's finance agreement did not contain any provision related to forum selection.

motion, the Busch and Insoft defendants attacked the imposition of late fees and a court ruling that the plaintiff was entitled to attorney fees. The district court disposed of the motion to reconsider on July 1, 2019.[5]

4. *Entry of judgments against the remaining defendants.* On May 17, 2018, PSFS 3 moved to enforce the stipulation against the remaining defendants and to have judgments entered pursuant to the same damages approach employed in the bellwether cases. In support of the motion, PSFS 3 submitted a chart showing the remaining payments owed by each defendant. On May 30 and May 31, a total of fifty-four defendants resisted, arguing, among other things, that without a trial on the remaining issues they would be deprived of due process.[6] They specifically stated that while rulings in the Busch and Insoft cases may be preclusive on issues of liability, the plaintiff failed to establish damages in the bellwether cases that would be applicable in the other cases. The defendants noted that damages calculations based on the number of missed payments times the amount of each missed payment would differ for each and every defendant. The defendants also suggested that entering final orders in the remaining cases should await the outcome of any appeal in the bellwether cases.

On June 6, PSFS 3 filed a reply urging the district court not to stay final resolution of the other cases that had already been pending for eight years. PSFS 3 argued that all that remained in the individual cases was a calculation of damages by multiplying the number of missed payments

---

[5]The two bellwether cases have settled and thus those judgments are not subject to this appeal.

[6]The May 30 filing was on behalf of three Gossett defendants where judgments were not entered against them and who are not parties to this appeal. The May 31 filing was on behalf of Charlip defendants in 51 individual cases.

times the amount of each payment and assessing default interest from the date of the filing of each petition.

To the extent there were due process concerns, PSFS 3 asked the district court to treat its filing as a motion for summary judgment. PSFS 3 argued that it had submitted necessary records supported by an affidavit to determine damages in each case. Unless the defendants' resist with admissible evidence that established a genuine issue of material fact, the district court should proceed to enter judgments in the cases. PSFS 3 closed by asking the district court to enter judgment in its favor in the cases and proposed that it prepare individual judgments as the district court might direct.

On December 14, the district court held a hearing on the pending motions. At the hearing, PSFS 3 again asserted that the manner of calculating damages had been determined and that there were no remaining factual disputes on damages. PSFS 3 noted that it filed its materials in May and that none of the defendants contested the damages calculations. PSFS 3 suggested that as no responses were filed, the district court could treat their submission as a motion for summary judgment and issue judgments including damages based on undisputed facts.

The defendants replied that the burden of proving damages in each case rested with the plaintiff and that a noncross-examined affidavit could not be used to shift the burden to the defendants. The defendants emphasized that the PSFS 3 motion to enforce the stipulation was not presented as a motion for summary judgment and, as a result, "we didn't go to the individual damage claims."

At the conclusion of the December 14 hearing, the district court directed PSFS 3 to submit proposed judgment entries as to all the

remaining defendants.  The district court told the parties "I won't rule on the final order judgment until I see what you present and give the defendants an opportunity to respond."  PSFS 3 submitted such proposals between January 11 and 29, 2019.  After the proposed judgments had been on file for nearly a month without resistances being filed by the defendants, the district court began entering judgments in individual cases on February 26 and running through April 8.  The defendants filed postjudgment motions, but none of them disputed the number of remaining payments with respect to any defendant.  The district court denied the posttrial motions.

## II.  Common Issues of Personal Jurisdiction.

**A.  Introduction.**  In this litigation, PSFS 3 relied upon a forum-selection clause in its standard finance agreement to establish consent to personal jurisdiction in Iowa courts by the defendants.  The problem is that Paragraph 13 of the finance agreement that related to forum selection did not expressly apply to the original contracting parties.  The forum-selection clause was a floating forum-selection provision that applied only in the event of an assignment of the contracts by NCMIC.

To remedy the lack of explicit consent to an Iowa forum in litigation with NCMIC, NCMIC assigned the finance agreements to a wholly owned related corporation, PSFS 3.  Because of the assignment, PSFS 3 argued that the floating forum-selection clause now applied and the district court in Polk County had jurisdiction over the cases pursuant to the parties' agreement.  The defendants, however, argued that the assignment was a sham transaction and that the floating forum-selection clause should not be applied under the facts of this case.

**B.  Standard of Review.**  Rulings on questions of personal jurisdiction are reviewed for correction of errors at law.  *Shams v. Hassan,*

829 N.W.2d 848, 853 (Iowa 2013).  A motion to dismiss is a special proceeding that requires findings of fact and conclusions of law.  *Cap. Promotions L.L.C. v. Don King Prods., Inc.*, 756 N.W.2d 828, 832–33 (Iowa 2008).  The plaintiff has the burden to set forth a prima facie case that jurisdiction is appropriate, with the district court "accept[ing] as true the allegations of the petition and the contents of uncontroverted affidavits." *Shams*, 829 N.W.2d at 853 (quoting *Addison Ins. v. Knight, Hoppe, Kurnik & Knight, L.L.C.*, 734 N.W.2d 473, 476 (Iowa 2007)).  Once "the plaintiff makes a prima facie case . . . , the burden shifts to the defendant to rebut that showing." *Id.*

### C.  Positions of the Parties.

1. *The defendants.*  Generally, the defendants raise several personal jurisdiction arguments that apply to all defendants.  First, the defendants claim that the assignments made by NCMIC to PSFS 3 were made for improper forum-shopping purposes after the commencement of federal litigation in Florida.  They noted that "the MDL panel rejected PSFS 3's claim to Iowa jurisdiction" and that the federal district court in Florida declared that "it would be inequitable to allow Defendants to shop the actions to another forum simply by assigning the Leases after the lawsuit [was] filed."  The defendants argue that this aspect of the unappealed and final Florida district court ruling conclusively binds the Polk County District Court through application of res judicata.

Second, aside from the alleged preclusive effect of the Florida litigation, the defendants attack the findings of the district court about the nature of the assignments at issue.  The district court found that PSFS 3 is a separate corporate entity, properly capitalized, and received the benefit of the monthly lease payments under the assignments.  The defendants attack the district court's findings on four fronts.

With respect to the validity of the assignments, the defendants claim that the district court's conclusion regarding PSFS 3 receiving the benefit of monthly lease payments received by PSFS 3 was in error. The defendants assert that, in reality, lease payments were originally collected by NCMIC as an agent for PSFS 3, transferred to PSFS 3, and then transferred back to NCMIC in the exact same amount. The transfer back to NCMIC was to pay off a note that PSFS 3 signed with NCMIC to purchase the assignment of the finance agreements. In the end, according to the defendants, NCMIC has assigned bare legal title to the financing agreements to PSFS 3 while keeping the full beneficial interest for itself. The sole purpose of the transaction, according to the defendants, was to promote NCMIC's forum-shopping interest.

Next, the defendants note that the record does not establish that PSFS 3 was properly capitalized. PSFS 3 had signed promissory notes to NCMIC for $13,000,000 and PSFS 3's initial capitalization of $500,000 was made with a promissory note from NCMIC to PSFS 3. The defendants claim that these facts do not support a finding of proper capitalization of PSFS 3.

In addition, the defendants assert that PSFS 3 is not really a "separate corporate entity." They note that PSFS 3 is wholly owned by NCMIC, "has nothing except an interlocking board of directors and officers, and holds bare legal title to the Financing Agreements (whose benefits remain flowing to NCMIC) for the sole purpose of triggering a floating forum jurisdiction clause."

Finally, the defendants assert that the assignment of the financing agreements was a sham. The defendants cite *Iowa Supreme Court Commission on Unauthorized Practice of Law v. A–1 Associates, Ltd.*, 623 N.W.2d 803, 808 (Iowa 2001) (en banc), in support of their position. In *A–*

*1 Associates*, we determined that a purported assignment of debt to a collection agency was a sham transaction to permit the collection agency, proceeding pro se, to practice law on the cheap while remitting the balance to the original assignor after collecting a fee. *Id.* According to the defendants, counsel for the plaintiff admitted that the purpose of the assignment to the new corporation was to provide a "lock" on jurisdiction and venue in Polk County.

Having shown that the transaction was, in fact, a "sham," the defendants claim that NCMIC violated its duty of good faith and fair dealing by attempting to use the forum-selection clause not pursuant to a valid arm's length assignment but instead for a forum-shopping purpose. In support of its argument, the defendants cite *Garcia v. Eidal International Corp.*, 808 F.2d 717, 722 (10th Cir. 1986), and *Vista Outdoor Inc. v. Reeves Family Trust*, 725 Fed. Appx. 17, 21 (2d Cir. 2018).

2. *Position of the plaintiff.* On the generally applicable personal jurisdiction issues, PSFS 3 asserts that the question in this case is whether application of the floating forum-selection provision is unfair, unreasonable, or unjust under Iowa caselaw. *See Karon v. Elliott Aviation*, 937 N.W.2d 334, 346 (Iowa 2020). PSFS 3 notes that the individual doctors all contracted with an Iowa company and that the contract would be governed by Iowa law. Even in the absence of an assignment, according to PSFS 3, the defendants should have expected to be sued in Iowa when a dispute arose. Thus, to the extent the forum floated in this case, it did not float very far from what the parties should have expected.

PSFS 3 asserts that the transaction was not a sham transaction but instead amounted simply to the creation of a related entity for the purpose of "monitoring the receipt of payments . . . and, where necessary, enforcing the Financing Agreements in court." PSFS 3 points out that the entity is

properly organized under Iowa law, is fully capitalized, has separate books, and follows corporate formalities.

PSFS 3 rejects the effort of the defendants to "pierce the corporate veil." PSFS 3 points out that the pierce the corporate veil doctrine is a misnomer and is really a remedial doctrine that permits liability to extend to individuals notwithstanding the presence of a corporate structure that might ordinarily limit the personal liability of individual owners. In any event, PSFS 3 argues there is no sham, and instead, there is transparency. The purpose of PSFS 3 is to allow for the consolidation of the finance agreements to actions in one forum and to enforce those agreements. It is not a case where unlawful or unauthorized activity is masked by an organizational structure as in *A–1 Associates*.

Finally, PSFS 3 addresses the res judicata issue. According to PSFS 3, no court has held that Iowa courts have no personal jurisdiction over any defendants in the Iowa cases. Instead, the Florida court determined that the floating forum-selection provisions were not "mandatory." As a result, there is no identical issues in the Florida case that precludes a finding of personal jurisdiction in the Iowa cases. *Emps. Mut. Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 22 (Iowa 2012).

**D. Discussion.**

1. *Res judicata.* We first begin with the claim that the Iowa litigation is barred by the doctrine of res judicata as a result of the decision of the federal district court in Florida. It is true, as the doctors point out, that the federal district court rebuffed efforts to have the Florida cases transferred to Iowa courts. And, it is true that PSFS 3 did not appeal those rulings.

But, it does not follow that the rulings denying the transfer of cases to Iowa amounted to a determination in federal court that Iowa courts

lacked personal jurisdiction over the doctors. There is nothing in the order of the MDL Panel or the Florida district court that takes a position on that precise issue. Instead, the rulings declined to take the affirmative step requested by PSFS 3, namely, to transfer the pending Florida cases to Iowa. That, of course, would defeat the plaintiff's choice of forum where the plaintiff filed its action first.

Thus, the MDL Panel and the Florida federal district court determined that it would be inequitable to transfer the cases to Iowa based on the assignment after the doctors' litigation had already been filed in Florida. Nothing more was decided. In order for res judicata to apply, however, the issue in the previous litigation must be identical. *Van Haaften*, 815 N.W.2d at 22; *Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 104 (Iowa 2011). As a result, the action in federal court has no res judicata effect on the unaddressed question of whether there was personal jurisdiction over the defendants in Polk County, Iowa.

2. *Sham transaction.* The defendants argue that the transfer of the finance agreements to PSFS 3 was a sham transaction of a kind that prevents enforcement of the floating forum-selection provision. But the assignment was not a sham. It was a transparent transaction with the limited purpose of creating an optimal enforcement mechanism with respect to the finance agreements.

Further, we agree with PSFS 3 that the pierce the corporate veil doctrine is not well designed for the context we deal with here. The question here is not one of remedy where the corporate structure has been abused, but one of compliance with an express contractual term that establishes personal jurisdiction in the courts of the state where the corporate headquarters of an assignee is located.

While the defendants urge us to apply a doctrine of good faith and fair dealing, we think it does not apply in this context. There is an express unqualified contractual provision here authorizing assignment of the interest created by the finance agreement. The doctrine of good faith and fair dealing "does not 'give rise to new substantive terms that do not otherwise exist in the contract,' " let alone override an express contractual provision. *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 34 (Iowa 2012) (quoting *Mid–Am. Real Est. Co. v. Iowa Realty Co.*, 406 F.3d 969, 974 (8th Cir. 2005)). Further, enforcement of the literal terms of the contract does not appear unfair, especially where the original party to the contract was headquartered in Clive, Iowa, and the contract expressly declared that the law of Iowa applied. The assignment in this case simply cannot be considered far afield from the parties' legitimate expectations. *Am. Tower, L.P. v. Loc. TV Iowa, L.L.C.*, 809 N.W.2d 546, 550–51 (Iowa Ct. App. 2011) ("Implied contractual duty of good faith and fair dealing in commercial contracts does not support an independent cause of action for failure to act in good faith under a contract; instead, the duty of good faith is meant to give the parties what they would have stipulated for at the time of contracting if they could have foreseen all future problems of performance." (quoting 13 Richard A. Lord, *Williston on Contracts* § 38.15, at 24 (4th ed. Supp. 2011))). Personal jurisdiction in an Iowa forum under these facts and circumstances certainly cannot be considered unfair, unreasonable, or unjust. *Karon*, 937 N.W.2d at 346. Finally, NCMIC and PSFS 3 have not acted in any way that has prevented the defendants from performing under the contract or from defending the underlying Iowa actions. *See* Restatement (Second) of Contracts § 205(d), at 99–104 (Am. L. Inst. 1981) (citing interference with or failure to cooperate in the other party's performance as violations of good faith and fair dealing).

### III.  Defendant-Specific Issues of Personal Jurisdiction.

**A.  Introduction.**    Aside from the common issues of personal jurisdiction arising from the assignment of interests in the finance agreements to PSFS 3, the defendants on appeal raise two challenges to personal jurisdiction specific to individual defendants.

First, with respect to eleven defendants, the defendants note that the actions against them were filed before the March 30, 2010 assignments and that *at the time of the filing of those actions*, there was no basis for personal jurisdiction over them in Polk County.  The efforts to amend the originally filed claims to name PSFS 3 as the real party in interest, according to these defendants, was a nullity and the actions should have been dismissed.

Second, with respect to the two Wineinger defendants, they point out that they entered into a unique finance agreement with NCMIC that had no provision related to venue of any kind.  And, as a result, any assignment of interest from NCMIC to PSFS 3 was meaningless as to them.

**B.  Preassignment Claims Brought by NCMIC.**

1. *Overview.*  Prior to the formation of PSFS 3 on March 30, 2010, NCMIC filed actions in Polk County District Court against eleven defendants.  After the March 30 assignment, the plaintiff amended its pleadings to name PSFS 3 as the real party.  The district court granted the amendments.  The only basis for personal jurisdiction asserted in these cases by PSFS 3 was the floating forum-selection clause which was triggered after the petitions in these cases were filed.

The individual defendants assert that because the original pleadings were filed at a time when there was no personal jurisdiction over the defendants, the original filings by NCMIC were a nullity from the beginning.  Because the original filings were nullities for lack of personal

jurisdiction when filed, the individual defendants assert they could not be later amended to add PSFS 3 as a party and assert personal jurisdiction under the floating forum-selection clause. If the original pleadings were a nullity, according to these individual defendants, they could not be later amended. Further, they claim, the assertion of personal jurisdiction based on the original petition is a violation of due process of law.[7]

In support of their argument, defendants cite *Evans v. Ober*, 256 Iowa 708, 129 N.W.2d 78 (1964). In that case, we found that an original notice that indicated the defendant should appear at the Lee County courthouse in Fort Madison when the action itself was filed in the Lee County courthouse in Keokuk was invalid. *Id.* at 709–10, 129 N.W.2d at 79. In *Evans*, we emphasized that the notice in the case was not merely voidable but void. *Id.* at 711, 129 N.W.2d at 80.

On appeal, PSFS 3 does not brief the issue. The district court, however, rejected the claim. According to the district court, Iowa Rule of Civil Procedure 1.201 provides that when an action is initially commenced by a party other than the real party in interest, it is not to be dismissed "until a reasonable time has been allowed after objection for ratification of commencement of the action by . . . the real party in interest." (Omission in original) (quoting Iowa R. Civ. P. 1.201). According to the district court, ratification of the prior action occurred when PSFS 3 sought to be substituted as the real party in interest in the litigation. The district court noted that "[i]t would serve nothing to dismiss any actions filed before the creation of PSFS 3, just to have them refiled in an identical pleading post-creation." The district court cited *Hammond v. Florida Asset Financial*

---

[7]The defendants do not identify whether their claim is brought under the United States Constitution or the Iowa Constitution. As a result, we consider the claims preserved under both the Federal and State Constitutions. *See, e.g.*, *State v. Harrington*, 805 N.W.2d 391, 393 n.3 (Iowa 2011); *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011).

*Corp.*, 695 N.W.2d 1, 8 (Iowa 2005), for the proposition that any dismissal of the original claims would be without prejudice, implying that there would be no barrier to refiling an essentially identical complaint.

2. *Discussion.* The preassignment individual defendants raise an interesting point, but ultimately their due process claim does not carry the day. The point of due process is to ensure that a party is not unfairly hauled into a distant forum without either sufficient minimum contacts to support personal jurisdiction or consent to jurisdiction in the distant forum. Here, the defendants received full notice of the action through the original petitions. While there might have been a question of personal jurisdiction at that point, the later assignment of the interest in the finance agreements from NCMIC to PSFS 3 removed that question. PSFS 3 could have been required to file a new original action against the defendants after the March 30 assignment, but that would have achieved nothing of substance as the defendants had notice of the action and knew that personal jurisdiction was being claimed by virtue of the assignment and the floating forum-selection clause. Under the circumstances, we think the district court's interpretation of Iowa Rule of Civil Procedure 1.201 as permitting the curing of a potential personal jurisdiction issue in a validly served original petition by later substitution of a real party in interest did not violate due process in this case. The resolution of the issue may not approach perfection, but the basic principles of fairness—the heart of due process—have not been offended here under the facts of the case.

**C. Wineinger Defendants' Claims.** Defendants Cedar Park Vision Center, P.A. and Jeff Wineinger (Wineinger defendants) have a unique claim related to personal jurisdiction. The plaintiff's petition against the Wineinger defendants alleged:

[E]ach agreed to personal jurisdiction and venue in any State or Federal Court located where the Lessor's or Assignee's principal corporate headquarters is located. The corporate headquarters of the Plaintiff is located in Clive, Polk County, Iowa. The Iowa District Court in Polk County is therefore the proper court in which to bring this action under the floating forum selection clause contained in the lease agreement.

But unlike the other defendants, the Wineinger defendants signed a unique finance agreement with PSFS (NCMIC). The unique Wineinger finance agreement did not contain *any* clause related to choice of forum.

In their answer and affirmative defenses, the Wineinger defendants made the same allegations regarding personal jurisdiction that were made by many of the defendants: "With respect to those allegations concern[ing] the personal jurisdiction of this court, Defendants affirmatively aver that the written contract speaks for itself, and denies that this court has personal jurisdiction over Defendants."

According to the Wineinger defendants, when documentation attached to a petition contradicts the underlying allegations, the contrary allegations are void. *WINBCO Tank Co. v. Palmer & Cay of Minn., L.L.C.*, 435 F. Supp. 2d 945, 955 (S.D. Iowa 2006). Therefore, the Wineinger defendants reason that PSFS 3 has failed to allege an adequate basis for jurisdiction and has failed to carry its burden of showing any basis for personal jurisdiction over the Wineinger defendants. *Shams*, 829 N.W.2d at 853. As a result, the Wineinger defendants seek reversal of the judgment entered against them on appeal.

PSFS 3 claims that the Wineinger defendants failed to preserve their claim. According to PSFS 3, Wineinger did not raise the issue in district court and instead simply joined the motion attacking the assignment from NCMIC to PSFS 3 in the consolidated case. PSFS 3 claims that by failure of the Wineinger defendants to raise the issue, PSFS 3 was prevented from claiming that the Wineinger defendants' financing with NCMIC, an Iowa

corporation, and their thirty-one payments to an Iowa company, is sufficient to establish jurisdiction in Iowa courts. *See, e.g., State Cent. Bank v. Berzanskis,* 149 F. Supp. 3d 1121, 1125–28 (S.D. Iowa 2015); *Agricredit Acceptance Co. v. Goforth Tractor, Inc.,* No. 00–1694, 2002 WL 1973195, at 3 (Iowa Ct. App. Aug. 28, 2002).

Based on our review of the record, we conclude that the Wineinger defendants in their answer denied that "the court ha[d] personal jurisdiction over Defendants." That is enough to raise the issue of personal jurisdiction.

But other than to file an answer generally denying personal jurisdiction, Wineinger took no further affirmative steps to obtain a district court ruling on the question. When the district court received a proposed judgment from the plaintiffs, no resistance was filed asserting that there was an unresolved claim of lack of personal jurisdiction.

Under the circumstances, with hundreds of cases pending, there was simply no way for the district court to know there was an underlying unique personal jurisdictional issue in the Wineinger matter. When the district court asked for proposed judgments in the cases, including the case involving the Wineinger defendants, it was incumbent upon them to speak up. When they did not, we conclude they failed to preserve their personal jurisdiction claim.

**IV. Due Process Challenge to Damages.**

**A. Introduction.** By the time of trial of the bellwether cases, there were hundreds of enforcement actions pending in Polk County District Court. The district court was clearly and appropriately trying to manage the litigation in an expeditious fashion without truncating the ability of the parties to litigate their claims and defenses. A key aspect of the management of the cases was the stipulation in which the parties agreed

to a determination of common issues through the trial of two bellwether cases. Although the stipulation stated that common issues would be resolved in the bellwether cases, the stipulation did not identify the common issues. The question here is whether the district court's method of calculating damages and the implementation of that method serially through the hundreds of pending cases deprived individual defendants of their day in court on damages.

**B. Standard of Review.** We review constitutional issues, such as whether due process rights have been violated, de novo. *State v. Clark*, 814 N.W.2d 551, 560 (Iowa 2012); *In re Marriage of Seyler*, 559 N.W.2d 7, 8 (Iowa 1997).

**C. Positions of the Parties.**

1. *The defendants.* The defendants declare that the district court's method of calculating damages in the cases of individual defendants violated due process of law. First, they contend that the individual defendants were deprived of the opportunity to contest how much money they paid, and how much was owing, under their individual contracts. Second, the defendants contend that final judgments were entered against as many as seventy-three defendants who were not parties to any contract. The defendants claim that they were not allowed to press these individual claims by the district court's action on damages in this case.

2. *The plaintiff.* The plaintiff begins by asserting that while the Charlip defendants asserted a right to have an individual trial on damages, the Gossett defendants did not preserve error on the question related to "the district court's alleged misnomer of several [defendants] in those judgments."

On the merits, PSFS 3 claims that contract damages for each defendant was not disputed. PSFS 3 begins its argument by canvassing

events surrounding the district court proceedings on May 17, 2018. On that date, PSFS 3 provided the district court and the parties with the simple mathematical formula for calculating damages in the bellwether cases—the number of monthly payments remaining multiplied by the monthly payment amount. Also on May 17, PSFS 3 filed a motion for enforcement of the stipulation and entry of judgment in the remaining cases. PSFS 3 notes that it attached to the motion a chart supported by a sworn declaration listing each defendant along with the applicable contractual monthly payment amount and the number of months outstanding.

Although PSFS 3 recognizes that some defendants on May 30 and May 31 objected to enforcement of the stipulation as depriving them of their ability to contest damages, the defendants did not provide any evidence that the damages calculations were inaccurate. In response, PSFS 3 urged the court to treat its filing as a motion for summary judgment on the damages question. In support of its argument that the district court could consider the filings as a motion for summary judgment, PSFS 3 cites *Stotts v. Eveleth*, 688 N.W.2d 803, 811–12 (Iowa 2004) (treating a motion to dismiss as if it was a motion for summary judgment and in an effort to conserve judicial resources, declining to remand the case to district court).

PSFS 3 further cites developments at the December 14 district court hearing on all pending motions. PSFS 3 notes that the defendants at the hearing made no argument that the PSFS 3 submission on damages was factually incorrect. PSFS 3 urged the district court to enter judgments against the remaining defendants. The defendants argued that the motion to enforce the stipulation was not styled as a "motion for summary judgment." According to PSFS 3, the district court directed PSFS 3 to

submit proposed judgments for the remaining cases and offered defendants the opportunity to contest the number of remaining payments. When PSFS 3 submitted proposed judgments, the defendants did not respond.

Under the circumstances, PSFS 3 asserts that the defendants' due process claims are without merit. According to PSFS 3, the defendants were entitled under due process to notice and an opportunity to be heard on the question of damages, and the defendants certainly had both. *Johnson v. Mitchell*, 489 N.W.2d 411, 414–15 (Iowa Ct. App. 1992).

**D. Discussion.** The defendants claim that they had a right to dispute the number and amount of payments owed by them to PSFS 3. We do not doubt the general proposition that the defendants were entitled by due process to a hearing on the issue of individual damages if they chose to put the question at issue in this litigation. The question is whether the defendants were in fact provided with the opportunity for their individualized damages claims.

The parties, of course, stipulated to a resolution of the common issues in the bellwether cases. We think the manner in which damages are calculated was a common issue that was decided in the bellwether cases. But the amount of damages, namely, how many payments were missed and in what amount, is not a common issue across the cases. After the resolution of the bellwether cases, each individual defendant was entitled to a hearing on the question of damages.

After the bellwether cases were decided, the district court invited the plaintiffs to submit individualized judgments in each case where the damages would be calculated under the methodology accepted in the bellwether cases. The inputs for the calculation came from one party,

PSFS 3. Again, the defendants were clearly entitled to contest these claimed amounts.

The district court seems to have recognized the need to provide the defendants with their day in court on the issue. At the hearing inviting PSFS 3 to submit proposed judgments, the district court expressly stated that once the proposed judgments were submitted, the district court would "give the defendants an opportunity to respond." Here, once the judgments were submitted, the district court seems to have put the burden of affirmatively filing a resistance on the defendants. When no resistances were filed, the district court, without a hearing, began entering a series of judgments against the individual defendants.

This procedure was a reasonable effort by the district court to manage a massive piece of consolidated litigation. When the proposed judgments were submitted, the defendants knew they had an opportunity to respond but chose not to file any resistance to the specific calculations in any individual case. The district court regarded the occasion as "put up or shut up" time on the question of factual challenges to individual damages. After nearly thirty days had passed without any resistances, the district court began entering judgments in the individual pending cases.

Under the circumstances, it cannot be said that the defendants were deprived of notice and an opportunity to be heard on the issue of individual damages. When the proposed judgments were submitted, they had an opportunity to object to the calculations or to offer any other objections to entry of judgment. The fact that they chose not to avail themselves of the opportunity they were provided does not create a problem of fundamental fairness in the litigation which was already eight years old at the time the district court fashioned its approach to the remaining cases.

**V. Validity of Finance Agreements Under Iowa Code Chapter 535.**

**A. Introduction.** The legal obligations that arise from finance agreements have been the subject of a number of important recent opinions of this court. *See generally GreatAm. Fin. Servs. Corp. v. Natalya Rodionova Med. Care, P.C.*, 956 N.W.2d 148 (Iowa 2021); *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65 (Iowa 2011); *C & J Vantage Leasing Co. v. Outlook Farm Golf Club, L.L.C.*, 784 N.W.2d 753 (Iowa 2010). In these types of three-party transactions, a vendor ordinarily solicits sales of certain equipment from a potential purchaser. Once a purchaser expresses interest, the purchaser completes a finance agreement with a third party obligating the purchaser to make a series of monthly payments for a period of time. The third-party financer then purchases the equipment from the vendor, executes a finance agreement with the purchaser, and looks to the purchaser to fulfill the obligation to make the payments required under the finance agreement. The finance agreement often has a hell-or-high-water provision that obligates the purchaser to make the payments required under the finance agreement absolutely and unconditionally. Although often characterized in the documents as a "finance lease," the labels in the documents are not determinative and the transactions may be treated as a sale with a security interest notwithstanding language to the contrary in the documentation. *Wolfe*, 795 N.W.2d 65, 73–75.

As in this case, disputes may arise when the purchaser claims that the vendor made false representations or promises regarding the purchase and seeks to stop making payments to the finance company. The finance company may defend by asserting that the payments under the finance

agreement are unconditional in light of the hell-or-high-water clause in the financing agreement.

In this case, in order to avoid an obligation to continue making payments to the finance company, the purchaser seeks to invalidate the finance agreement by claiming two of its provisions violate Iowa Code chapter 535 related to money and credit. They claim that by failing to disclose an interest rate, the plaintiff violated Iowa Code section 535.17(1) which requires that the material terms of credit transactions be disclosed. Second, the defendants assert that the actual rate of interest charged in the transaction was usurious under Iowa Code section 535.2(1).

**B. Standard of Review.** We review issues of statutory construction for errors at law. *Wolfe*, 795 N.W.2d at 73.

**C. Positions of the Parties.**

1. *The defendants.* The defendants assert that the finance agreements involved in this matter are "credit agreements" under Iowa Code chapter 535. They note that under Iowa Code section 535.17(5)(*c*), a " '[c]redit agreement' means any contract made or acquired by a lender to loan money, finance any transaction, or otherwise extend credit for any purpose, and includes all of the terms of the contract." The defendants assert that the finance agreements in this case, regardless of their label as leases, fall within the scope of the definition of a credit agreement under the statute.

Under Iowa Code section 535.17(1), a credit agreement must provide "all of the material terms of the agreement." The statute does not define material. But the defendants argue that the material terms of the finance agreements in this case include the amount loaned and the interest rate on the loan. *Fairfield Six/Hidden Valley P'ship v. Resol. Tr. Corp.*, 860 F.

Supp. 1085, 1089 (D. Md. 1994); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

The defendants cite the Wineinger contract as an example of an equipment financing agreement that satisfies the requirements of Iowa Code section 535.17(1). The Wineinger agreement discloses the total amount financed, the monthly payment, and the number of months over which the payments are to be made. From this information, the parties can calculate the rate of interest on the loan.

But in the other finance agreements in this case, it is not possible to calculate the interest rate on the loaned amount. To buttress their argument that the interest rate is a material term, the defendants point to Iowa's usury statute, which permits the parties obtaining credit for business purposes to agree in writing to pay a rate of interest higher than the statutorily established rate. Iowa Code § 535.2.

The defendants also point to the terms of the finance agreement as establishing that there is, in fact, an interest rate on the loaned amounts, even though it is not disclosed. Paragraph 1 of the finance agreement states that:

> If it is determined that your total payments result in an interest rate higher than allowed by applicable law, then any excess interest collected will be applied to the repayment of principle [sic] and interest will be charged at the highest rate allowed by law.

Further, the defendants point out that prior to the assignment of the finance agreements to PSFS 3, NCMIC prepared amortization schedules for each transaction that contained principal and interest calculations.

2. *The plaintiff.* At the outset, the plaintiff claims that the defendants failed to preserve error on the issue of whether the finance agreements violate the credit agreement disclosure provision of Iowa Code

section 535.17 or the usury provision of Iowa Code section 535.2. The plaintiff claims that these issues should have been litigated in the Florida district court litigation, where the federal court considered the common issues of enforceability among the mass participants in the litigation. As a result, the plaintiffs claim the defendants are precluded from raising the issue in the Iowa actions. *See Van Haaften*, 815 N.W.2d at 22–23.

On the merits, the plaintiff does not contest the applicability of Iowa Code chapter 535 to the finance agreements. Instead, the plaintiff points out that each finance agreement contains the equipment being financed, the number of payments to be made (60), the frequency of each payment (monthly), and the amount of each payment (which was typically $508).[8] These disclosures, according to the plaintiff, are sufficient to satisfy the requirements of Iowa Code section 535.17(1).

The plaintiff cites *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, in support of their argument. In *Wolfe*, the finance agreement contained the same key terms as the finance agreement in this case. *Id.* at 71–72. On the question of lack of disclosure of interest rate, the *Wolfe* court observed:

> Although the agreement did not expressly list an interest rate, it did provide Lake MacBride was to make sixty monthly payments of $299 to C & J. Section 535.17(1) contains no requirement that the interest rate must be listed separate from the total payment required under the agreement.

*Id.* at 82. The *Wolfe* case further compared Iowa Code section 535.17(1) with federal law which expressly requires the disclosure of interest rates

---

[8]The agreements are labeled "Equipment Lease Application and Agreement." Regardless of their label, they operate as finance agreements supporting the purchase of the equipment in this case. We therefore characterize the documents as finance agreements rather than leases.

in consumer leases and consumer credit transactions. *Id.* at 82 (citing 5 U.S.C. § 1632).

The plaintiff further argues that there is no requirement that the finance agreement disclose the purchase price paid by a finance company to the vendor of commercial equipment as a material term under Iowa Code section 535.17(1). According to the plaintiff, the price paid by the finance company to the vendor was not disclosed in *Wolfe*. While there is reference to the term "price" in *Wolfe*, in context, the term is in reference to the total amount to be paid under the finance agreement. *See generally Wolfe*, 792 N.W.2d 65.

Next, on the question of the usury statute in Iowa Code section 535.2, the plaintiff argues that the statute simply does not apply. The plaintiff again cites *Wolfe*, which noted that a beverage cart was used in connection with a business purpose and that, as a result, a business could agree to pay any rate of interest and thus could not invoke the usury statute. *Wolfe*, 795 N.W.2d at 82.

In the alternative, the plaintiff claims that even if the finance agreements were required to disclose a higher rate of interest, the finance agreements would remain enforceable. According to the plaintiff, Iowa law provides that if the interest rate in a business transaction is usurious or if a creditor fails to provide in a written agreement for any rate of interest, the remedy is interest awarded at the lower statutory interest rate of 5%. *Power Equip., Inc. v. Tschiggfrie*, 460 N.W.2d 861, 863 (Iowa 1990).

**D. Discussion.** We think there is a serious question of whether the defendants can raise the disclosure and usury issues in light of the Florida declaratory judgment action in which the parties litigated common issues related to enforcement of the finance agreements. Ordinarily, a litigant does not get two bites of the apple in different fora.

In any event, on the chapter 535 issues, we find that the *Wolfe* case is controlling. The issues in *Wolfe* were identical to those posed in this case. The finance agreement simply disclosed that the purchaser was required to make "sixty monthly payments of $299." *Wolfe*, 795 N.W.2d at 82. We declined to impose a requirement that interest rate also be disclosed. *Id.* We held that the terms contained in the agreement were sufficient to satisfy the requirements of section 535.17(1). *Id.* Although there is no direct mention in *Wolfe* of a claim that the purchase price paid by the finance company to the vendor was required to be disclosed, the logic of the decision clearly compels a negative answer. The number of payments over time and the amount of each payment is sufficient disclosure of material terms under the statute.

*Wolfe* also disposes of the usury argument. In *Wolfe*, we noted that, as here, the transaction was for a business purpose. *Id.* Under the statute, a person borrowing money for a business purpose is permitted in writing to agree to any rate of interest in a credit transaction. Iowa Code section 535.2(2)(*a*)(5). In *Wolfe*, we concluded that because the business purchaser could agree in writing to any rate of interest, there was no violation of the usury statute. 795 N.W.2d at 82. Therefore, whatever the interest rate might have been or however the interest rate would have been calculated would not be usurious. *See id.* The reasoning applies in this case with full force.

**VI. Failure to Prove Damages Arising from Breach of Contract.**

**A. Introduction.** The defendants challenge whether the plaintiff proved the fact of damages in these cases. The district court accepted the basic methodology of the plaintiff in calculating base damages, namely, by multiplying the number of missed payments by the amount of each

payment. The defendants claim that this approach to damages was improper.

**B. Standard of Review.** The standard of review on the question of whether damages were proven in this case is for correction of errors at law. *Flom v. Stahly,* 569 N.W.2d 135, 139 (Iowa 1997).

**C. Positions of the Parties.**

1. *The defendants.* The defendants argue that PSFS 3 failed to prove damages arising from the alleged breach of contract. With respect to damages, the defendants emphasize that damages are limited to those that are "foreseeable or reasonably contemplated by the parties" when they entered into the agreement. (Citing *Kuehl v. Freeman Brothers Agency, Inc.,* 521 N.W.2d 714, 718 (Iowa 1994).) They note that damages must be proven with "reasonable certainty." *Dopheide v. Schoeppner,* 163 N.W.2d 360, 367 (Iowa 1968).

The defendants proceed to project these general principles against the record developed in the bellwether cases. The defendants assert that PSFS 3 witnesses could not explain, for instance, when exactly monthly payments were due under the contract. The defendants note that the software program used to compute damages was a program designed to manage leases and not equipment finance agreements. Further, the defendants observe that while NCMIC had software that could calculate amortization schedules for each contract, no such calculations were produced. Thus, the defendants argue that while the payments consisted of both principal and interest, PSFS 3 failed to provide a calculation allocating the payments. According to the defendants, the mere proof of missing contractual payments does not amount to a prima facie case of damages.

The defendants assert that the damages awarded by the district court—a simple calculation of unpaid monthly payments multiplied by the amount of each payment—was inconsistent with the default clause in the finance agreement. The default provision states: "If You default, We may require that You pay 1) all past due amounts under this Lease, and 2) all future amounts owed for the unexpired term, discounted at the rate 6% per annum."

The defendants claim that future amounts "owed for the unexpired term" can only refer to future principal amounts. Because the future principal amounts due under each finance agreement have not been calculated, the defendants claim damages in these cases cannot be calculated.

2. *The plaintiff.* The plaintiff responds that the basic starting point for the calculation of damages in this case is a simple calculation of the amount of the monthly payment multiplied by the number of missed payments. The plaintiff asserts that a commonplace measure of damages is to put the plaintiff in the place he or she would have occupied had the contract been performed. *Aurora Bus. Park Assocs., L.P. v. Michael Albert, Inc.*, 548 N.W.2d 153, 157 (Iowa 1996) (en banc). Further, the parties expressly contracted for the acceleration of balances and the remedy of payment of all amounts that the plaintiff would have received under the contract. Parties are generally free to provide for their own remedies for breach of contract. *Wolfe*, 795 N.W.2d at 77.

**D. Discussion.** On this issue, we agree with the plaintiff. The contract itself called for a number of payments over a period of years in a specific amount. Providing the plaintiff with the payment it was entitled to if the contract had been honored is an appropriate approach to damages in this case. *See Aurora Bus. Park Assocs., L.P.,* 548 N.W.2d at 157.

Further, the parties expressly agreed to this remedial provision in the contract. The argument of the defendants that the plaintiff failed to prove damages is without merit.

### VII. Unconscionability of Default Interest Rate.

**A. Introduction.** Under Paragraph 9 of the finance agreements, the defendants agreed to pay interest on all past due amounts at the rate of 1.5% per month or the highest amount permitted by law. The defendants attack this provision as unconscionable under Iowa Code section 554.13108(1).

**B. Standard of Review.** Unconscionability is a question of law and is subject to review for correction of errors at law. *See* Iowa Code § 554.2302(1); *Casey v. Lupkes*, 286 N.W.2d 204, 207 (Iowa 1979).

**C. Positions of the Parties.**

1. *The defendants.* The defendants assert that the damages calculation imposed by the district court included approximately an 8.99% per annum undisclosed nondefault interest rate arising from the finance agreement and an additional 18% per annum penalty for late payment. According to the defendants, the total default interest rate was thus 26.99% per annum not including any late fees.

The defendants assert that under Iowa law, the propriety of awarding default interest is subject to review by the court. *Carson Grain & Implement, Inc. v. Dirks*, 460 N.W.2d 483, 486 (Iowa Ct. App. 1990). According to the defendants, the default interest rate must amount to an appropriate liquidated damages provision and not a penalty. By accelerating the monthly payments after default which included the undisclosed 8.99% interest rate, and then adding an additional 18% interest rate, the defendants have obtained an unlawful double recovery.

In the alternative, the defendants claim that default interest may be recovered only after accelerating the debt. The defendants claim PSFS 3 accelerated the principal amounts only by filing suit and that, as a result, any interest penalty should arise only as of the month following the filing of the action. But because the interest rate was not disclosed in the finance agreements, and no amortization schedule was provided, it is not possible to know the real amount of total interest if the 18% default penalty is imposed. Because the damages calculation is speculative, the defendants ask that the default interest portion of the final judgments be stricken as an unenforceable penalty under Iowa law.

2. *The plaintiff.* The plaintiff responds by arguing that there is nothing unlawful about an acceleration clause. On the issue of triggering acceleration, the plaintiff states there is no requirement that the creditor take action to accelerate the amount due. *Aurora Bus. Park Assocs., L.P.*, 548 N.W.2d at 154. Once the actions were filed, according to the plaintiff, the future payments were accelerated.

The plaintiff points out that the parties agreed to an 18% default interest. The plaintiff notes that the defendants have been in default for ten years and that the plaintiff has been burdened by the need to track the defaulted accounts as impaired assets, monitor their status, and monitor the defendants' ability to pay. The plaintiff further notes that Iowa courts have long upheld an increased rate of interest upon default. *See Fed. Land Bank of Omaha v. Wilmarth*, 218 Iowa 339, 343, 252 N.W. 507, 510 (1934); *see also In re Johnston*, No. 03–03495S, 2004 WL 3019472, at *2, *7 (Bankr. N.D. Iowa Dec. 20, 2004). The plaintiffs claim that default interest rates of 18% or higher are standard in the equipment finance industry. *See Sec. State Bank v. Soults Farms, Inc.*, No. 03–0494, 2004 WL 792673, at *4 (Iowa Ct. App. Apr. 14, 2004). The plaintiff claims that in

*Wolfe*, the court held a substantially similar agreement was not unconscionable. 795 N.W.2d at 80–81.

**D. Discussion.** On this issue, we look first to the contractual terms. The parties agreed that in the event of a default, there would be an acceleration of all the amounts due, discounted by 6% per year on future payments. Upon that amount, the parties agreed that a default interest rate of 18% per year would apply. Certainly, in a business contract, a presumption arises that the agreement of the parties on financial terms is enforceable.

A party must climb a tall hill to establish that a term of a business agreement is unconscionable. In order to be unconscionable, a provision must be such that no person in his or her right senses "would make [it] on the one hand, and . . . no honest and fair [person] would accept [it] on the other." *Smith v. Harrison,* 325 N.W.2d 92, 94 (Iowa 1982) (quoting *Casey,* 286 N.W.2d at 207). As noted in *Wolfe,* factors to be considered include "assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness." 795 N.W.2d at 80 (quoting *C & J Fertilizer, Inc. v. Allied Mut. Ins.,* 227 N.W.2d 169, 181 (Iowa 1975)) (en banc). The doctrine of unconscionability is an extreme one. It is not available to rescue a party from a bad bargain. *Wolfe,* 795 N.W.2d at 80; *Smith,* 325 N.W.2d at 94.

We find nothing in the record, either procedurally or substantively, to support a claim that the default interest rate meets the demanding standards of unconscionability. We note that a number of other courts have upheld 18% interest rates in a variety of contexts. *See Cheshire Mortg. Serv., Inc. v. Montes,* 612 A.2d 1130, 1135–38 (Conn. 1992) (determining an 18% interest in real estate contract was not unconscionable); *In re White River Conservancy Dist. v. Commonwealth of*

*Eng'gs, Inc.*, 575 N.E.2d 1011, 1017 (Ind. Ct. App. 1991) (determining 18% interest rate not unconscionable). We also note that while the finance agreement also provides for a late fee on unpaid balances, the plaintiff did not seek to enforce that provision in this proceeding.

The defendants claim that the plaintiff is collecting "double interest" because the payments made to them are, in fact, a combination of interest and principal. We do not find that this theory makes the 18% default interest rate unconscionable. Defendants cite *Carson Grain & Implement, Inc. v. Dirks*, 460 N.W.2d 483. But *Carson Grain* is plainly distinguishable. In *Carson Grain*, the court determined that it would not apply both the default rate of 18% interest and the statutory rate of judgments. *Id.* at 486. We do not face this kind of double interest situation here.

### VIII.  Award of Attorney Fees.

The defendants suggest that the district court erred in determining PSFS 3 was entitled to an award of attorney fees. According to the defendants, there was no proof at trial that PSFS 3 paid any attorney fees and that PSFS 3 has no obligation to indemnify NCMIC for attorney fees that it may have incurred in connection with the litigation.

While the district court did enter an attorney fees order in the two bellwether cases, those matters have been resolved and their appeals dismissed. With respect to the other cases, the district court has not entered a court order on that issue. Once the district court rules, the question of attorney fees is separately appealable. Iowa R. App. P. 6.103(2) ("A final order or judgment on an application for attorney fees entered after the final order or judgment in the underlying action is separately appealable.").

**IX. Conclusion.**

For the above reasons, we affirm the district court's rulings and judgments.

**AFFIRMED.**